# In the United States Court of Federal Claims

No. 14-924L
Filed: April 28, 2017

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| YURIY PRAKHIN, | Claim Accrual; |
| Plaintiff, | Jurisdiction; |
| | Motion to Dismiss, Rule of the United States Court of Federal Claims ("RCFC") 12(b)(1); |
| v. | Statute of Limitations, 28 U.S.C. § 2501; |
| THE UNITED STATES, | Takings Clause, |
| Defendant. | Fifth Amendment to the United States Constitution. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Rachel L. Kaylie**, Law Office of Yuriy Prakhin, Brooklyn, New York, Counsel for Plaintiff.

**Carter F. Thurman**, United States Department of Justice, Washington, D.C., Counsel for the Government.

## MEMORANDUM OPINION AND ORDER DENYING THE GOVERNMENT'S RENEWED MOTION TO DISMISS A TAKINGS CLAUSE CLAIM

**BRADEN**, *Chief Judge*.

## I.    RELEVANT FACTUAL BACKGROUND.[1]

On December 19, 1995, Yuriy Prakhin purchased waterfront property at 3857 Ocean View Avenue, Brooklyn, New York, 11224 ("the Property"). Compl. at ¶ 1. This real estate is located

---

[1] The relevant facts discussed herein were derived from: (1) the September 29, 2014 Complaint ("Compl. at ¶¶ 1–18"); and (2) the attached Exhibits ("Compl. at Exs. A–C"), including the factual background in *Vaizburd v. United States*, 384 F.3d 1278, 1280–82 (Fed. Cir. 2004), and the remand decision in *Vaizburd v. United States*, 67 Fed. Cl. 499 (2005).

In addition, Plaintiff relies on the following proffered evidence in support of the court's jurisdiction: (1) a June 2014 United States Army Corps of Engineers ("Army Corps") Brochure, providing an overview of the origins of Sea Gate Project ("Sea Gate Brochure"); (2) the May 25, 2016 Deposition of Yuriy Prakhin ("5/25/16 Prakhin Dep."); (3) the May 26, 2016 Deposition of Anthony Ciorra ("5/26/16 Ciorra Dep."); (4) the August 26, 2016 Declaration of Anthony Ciorra ("8/26/16 Ciorra Decl."); (5) the October 17, 2016 Affidavit of Stephen M. Breslof ("10/17/16

in the Sea Gate Community, "a gated community on the southern side of Coney Island in Brooklyn, New York that includes seaside homes facing a private beach." *Vaizburd*, 384 F.3d at 1280. Mr. Prakhin owns two lots: on one a house is located; the other is "an empty lot which starts from the bulkhead and continue[s] toward the water for 400 feet." 10/17/16 Prakhin Dep. at 12.



Sea Gate Brochure at 1 (depicting the Sea Gate Community).

In the early 1990s, the Army Corps launched a project to restore sand on the Coney Island beaches (the "Coney Island Project"), that had eroded over the years. *Vaizburd*, 384 F.3d at 1280. By 1995, when the initial stage of the Coney Island Project was completed, the Army Corps had deposited approximately three million cubic yards of sand on the Coney Island beaches. *Id.* Unfortunately, the Army Corps' restoration effort caused significant accretion of sand in the Sea Gate Community, particularly in the Gravesend Bay area, where the Property is located. *Id.* The residents of this area repeatedly complained to the Army Corps. *Id.*

\*       \*       \*

On August 10, 1998, the Army Corps agreed to meet with U. S. Congressman Jerrold Nadler to discuss the sand accretion problem. 5/26/16 Ciorra Dep. at 124–25. "Most of the

Breslof Aff."); (6) the October 17, 2016 Affidavit of Yuriy Prakhin ("10/17/16 Prakhin Aff."); and (7) several articles from the Army Corps' website ("Army Corps Articles"). *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988) ("If a motion to dismiss for lack of subject matter jurisdiction . . . challenges the truth of the jurisdictional facts alleged in the complaint, the [trial]court may consider relevant evidence in order to resolve the factual dispute.").

discussion had to do with . . . securing the [congressional] authorization needed to [implement a long-term solution] to minimize the sand accumulation that had been occurring along the Gravesend Bay shoreline." 5/26/16 Ciorra Dep. at 125. At the August 10, 1998 meeting, the Army Corps also discussed "interim measures that [could] take place . . . while [the Army Corps was] waiting for the authorization and appropriations needed to design and construct the [long-term] project." 5/26/16 Ciorra Dep. at 125.

In October 2000, the Army Corps undertook a second effort to restore the Sea Gate beach and protect Gravesend Bay from further sand accretion. *Vaizburd*, 67 Fed. Cl. at 501. This entailed removing 100,000 cubic yards of sand from the waters immediately adjacent to Norton Point and depositing it on the beach at Sea Gate. *Id.* As a result, a trough or depression off North Point was created to intercept most of the sand eroding from Sea Gate beach. *Id.* The Army Corps decided that the only long term solution to the Gravesend problem was to construct a series of "T-groins" on Sea Gate beach. *Id.*

It took the Army Corps until 2004 to complete a Limited Reevaluation Report for the Sea Gate Project and complete the design for the Sea Gate Project. Sea Gate Brochure at 2; 5/26/16 Ciorra Dep. at 51.

From 2004 to 2012, however, the Army Corps did not perform any work on the Sea Gate Project, because it was waiting for the State of New York to approve a portion of the Project's funding. 5/26/16 Ciorra Dep. at 155.

In 2013, after Hurricane Sandy devastated parts of Coney Island, Congress enacted the Disaster Relief Appropriations Act, providing 100% of the funding needed to complete the Sea Gate Project. *See* DISASTER RELIEF APPROPRIATIONS ACT OF 2013, Pub. L. No. 113-2, 127 Stat. 4; Sea Gate Brochure at 2. Thereafter, the Army Corps issued a second Limited Reevaluation Report. Sea Gate Brochure at 2. In the fall of 2014, the Army Corps began work on the Sea Gate Project; that work was completed in the spring of 2016. Army Corps Articles at 3.

## II.   PROCEDURAL HISTORY.

On September 29, 2014, Mr. Prakhin ("Plaintiff") filed a Complaint in the United States Court of Federal Claims alleging that the Army Corps' Coney Island Project caused sand to accumulate on his property at 3857 Ocean View Avenue, resulting in a permanent physical taking for which Plaintiff is entitled to just compensation under the Takings Clause of the Fifth Amendment to the United States Constitution. ECF No. 1, Compl. at ¶ 12–13.

On December 15, 2014, the Government filed a Motion To Dismiss ("12/15/14 Gov't Mot."), pursuant to Rule of the United States Court of Federal Claims ("RCFC") 12(b)(1), arguing that 28 U.S.C. § 2501[2] barred the September 29, 2014 Complaint, because Plaintiff's Takings

---

[2] Title 28 U.S.C. § 2501 provides, in relevant part: "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first *accrues*." 28 U.S.C. § 2501 (emphasis added).

Clause claim accrued more than six years before it was filed.  ECF No. 7, 12/15/14 Gov't Mot. at 1.

On March 6, 2015, Plaintiff filed an Opposition, arguing that, from 1995 to 2014, the Army Corps repeatedly promised to remove sand accumulating on Plaintiff's property, delaying the accrual of that claim.  ECF No. 12, 3/6/15 Pl. Resp. at 6–7.

On April 20, 2015, the Government filed a Reply ("4/20/15 Gov't Reply"), contending that Plaintiff's Takings Clause claim accrued, when the court's June 30, 2003 Memorandum Opinion in *Vaizburd v. United States*, 57 Fed. Cl. 221 (2003), found a taking had occurred in a related case. ECF No. 14, 4/20/15 Gov't Reply at 3.  In addition, photographs documenting the historical accumulation of sand on the waterfront properties made evident "the permanent nature" of the sand accumulating on Plaintiff's property.  4/20/15 Gov't Reply at 4.  The Government emphasizes that the purpose of the Sea Gate Project was to prevent further sand from accreting on Plaintiff's property, not to remove the sand that previously accumulated.  4/20/15 Gov't Reply at 6.

On July 29, 2015, the court issued a Memorandum Opinion And Order denying the Government's December 15, 2014 Motion To Dismiss, without prejudice.  *See Prakhin v. United States*, 122 Fed. Cl. 483 (2015).  Therein, the court determined that whether the Army Corps promised to remove the sand on Plaintiff's property was a disputed fact and Plaintiff was entitled to jurisdictional discovery.  *Id.* at 490.

On August 29, 2016, the Government filed a Renewed Motion To Dismiss ("8/29/16 Gov't Mot."), again arguing that the Army Corps never promised to mitigate or remove the accumulated sand from Plaintiff's property.  ECF No. 25, 8/29/16 Gov't Mot. at 1.

On October 17, 2016, Plaintiff filed an Opposition ("10/17/16 Pl. Resp."), asserting that the evidence disclosed during jurisdictional discovery demonstrates "the long-term nature of the taking is not yet evident and the extent of the damage is not yet foreseeable," because the Army Corps repeatedly promised that it was going to remove the sand from Plaintiff's property.  ECF No. 30, 10/17/16 Pl. Resp. at 17–20.

On February 2, 2017, the Government filed a Reply ("2/2/17 Gov't Reply"), arguing that Plaintiff failed to present specific evidence to demonstrate that the Army Corps promised to remove the sand from his property and mischaracterized the governing law.  ECF No. 36, 2/2/17 Gov't Reply at 1.

## III.   DISCUSSION.

### A.   Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money

4

damages . . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"). Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government." *United States v. Mitchell*, 463 U.S. 206, 216 (1983) (quoting *Testan*, 424 U.S. at 400). Plaintiff must also make "a nonfrivolous allegation that [he] is within the class of plaintiffs entitled to recover under the money-mandating source." *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

In this case, the September 29, 2014 Complaint alleges that the Army Corps effected a physical taking of Plaintiff's property, without just compensation, in violation of the Takings Clause of the Fifth Amendment to the United States Constitution. 9/29/14 Compl. at ¶ 12–13. It is well established that the "Takings Clause of the Fifth Amendment is a money-mandating source for purposes of Tucker Act jurisdiction." *Jan's Helicopter*, 525 F.3d at 1309 (citing *Moden v. United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005)).

For this reason, the court has determined that the September 29, 2014 Complaint alleges a claim that is based on a money-mandating source.

## B.   Standing.

Standing is a jurisdictional issue. *See Myers Investigative And Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."); *see also Glass v. United States*, 258 F.3d 1349, 1355 (Fed. Cir. 2001) ("The United States Constitution limits judicial power to the resolution of actual 'cases' or 'controversies.'"). Although constitutional standing requirements are derived from Article III of the United States Constitution, those requirements apply to the United States Court of Federal Claims. *See Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) ("The Court of Federal Claims, though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III.").

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). In *Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167 (2000), the United States Supreme Court held that the plaintiff must show:

> (1) [plaintiff] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 180–81. The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

The September 29, 2014 Complaint alleges a physical taking of Plaintiff's property by the accretion and accumulation of sand on his property—an injury that is actual, concrete and particularized. Compl. at ¶¶ 10–14. In addition, the alleged taking is fairly traceable to the Army Corps' Coney Island and proposed Sea Gate Projects and any economic injury suffered by Plaintiff can be redressed, if the court determines there is liability and awards just compensation.

For these reasons, the court has determined that Plaintiff has standing to seek adjudication of the Takings Clause claim alleged in the September 29, 2014 Complaint.

### C.   Standard Of Review For A Motion To Dismiss, Pursuant To RCFC 12(b)(1).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion." *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) (allowing a party to assert, by motion, "lack of subject-matter jurisdiction"). When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is generally "obligated to assume all factual allegations [of the complaint] to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

If a motion to dismiss challenges the factual basis for the court's subject matter jurisdiction, however, "the allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted as true[.]" *Shoshone Indian Tribe of Wind River Reservation, Wyo. v. United States*, 672 F.3d 1021, 1030 (Fed. Cir. 2012). "All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact-finding by the district court." *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993). In these cases, the court "may consider relevant evidence in order to resolve the factual dispute." *See Reynolds*, 846 F.2d at 747.

### D.   Whether The Takings Clause Claim Alleged In The September 29, 2014 Complaint Is Time-Barred, Pursuant To 28 U.S.C. § 2501.

#### 1.   The Government's Argument.

The Government does not contest that the accretion of sand on Plaintiff's property was caused by the Army Corps and sufficient to allege a physical taking by December 31, 1995. 8/29/16 Gov't Mot. at 1; *see also Prakhin*, 122 Fed. Cl. at 489 ([T]he process of accretion had sufficient impact, *i.e.*, impeded the plaintiff's access to the water, and was sufficiently noticeable and recurring to constitute a taking, as of December 31, 1995." (citing *Vaizburd*, 57 Fed. Cl. at 240)). But, the Government argues that the United States Court of Federal Claims does not have jurisdiction to adjudicate the Takings Clause claim alleged in the September 29, 2014 Complaint, because that claim accrued on December 31, 1995, and is barred by the six-year statute of limitations under 28 U.S.C. § 2501. 8/29/16 Gov't Mot. at 8, 11. The Government further asserts that Plaintiff has not established, by a preponderance of evidence, that accrual of the Takings

Clause claim was stayed until at least September 29, 2008 (six years before Plaintiff filed the September 29, 2014 Complaint). 8/29/16 Gov't Mot. at 11. Specifically, Plaintiff has not demonstrated that the Army Corps promised to mitigate the sand-accretion problem on Plaintiff's property in a manner that made the predictability and permanence of the damage to his property justifiably uncertain. 8/29/16 Gov't Mot. at 12.

### 2.    Plaintiff's Response.

Plaintiff responds that the six-year statute of limitations, under 28 U.S.C. § 2501, does not bar the Takings Clause claim alleged in the September 29, 2014 Complaint, because that claim has not yet accrued, since the Army Corps repeatedly promised to remove the accreted sand on his property, making the permanency of the taking uncertain. 10/17/16 Pl. Resp. at 5, 20. In support, Plaintiff proffered: (1) a 10/17/16 Affidavit of Stephen Breslof, former Treasurer and President of the Sea Gate Association; (2) several articles from the Army Corps' website; (3) the 5/25/16 deposition of Yuriy Prakhin; and (4) a June 2014 brochure summarizing the history of the Sea Gate Project. Moreover, under the "justifiable uncertainty" doctrine, the Army Corps' promise in this case to make the sand-accretion problem affecting Plaintiff's land "less severe, harmful, or painful" is sufficient to stay accrual of his Takings Clause claim. 10/17/17 Pl. Resp. at 9. It is not necessary for the Army Corps to promise removal of all the accreted sand on Plaintiff's property, returning the land to its pre-Coney Island Project condition. 10/17/17 Pl. Resp. at 9.

### 3.    The Government's Reply.

The Government replies that "bare jurisdictional assertions, standing alone," are insufficient to satisfy Plaintiff's burden to establish jurisdiction by a preponderance of the evidence. 2/3/2017 Gov't Reply at 2. Plaintiff relies on "vague recollections, an affidavit of a member of [the Sea Gate] homeowner's association, and [Army] Corps website printouts" to establish that the Army Corps' mitigation efforts and promises rendered the permanency of the sand accretion on Plaintiff's property uncertain. 2/3/17 Gov't Reply at 3. In fact, Plaintiff proffered no evidence to demonstrate that the Army Corps ever committed to any mitigation efforts regarding the accreted sand on Plaintiff's property. 2/3/17 Gov't Reply at 7.

In addition, Plaintiff misconstrues the "justifiable uncertainty" principle. 2/3/17 Gov't Reply at 7. A government's promise to mitigate a situation that otherwise would constitute a taking does not stay the accrual of a Takings Clause claim, unless that promise provides an objective basis for the property owner to believe that the relevant damage is temporary. 2/3/17 Gov't Reply at 9. Moreover, a government's promise does not stay accrual merely because it commits to making the property owner's situation less severe or harmful. 2/3/17 Gov't Reply at 9.

### 4.    The Court's Resolution.

Congress authorized the United States Court of Federal Claims with jurisdiction to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . for liquidated or unliquidated damages in cases not sounding in tort[,]" under the Tucker Act, 28 U.S.C. § 1491, unless the

plaintiff's claims are filed within six years after that claim "first accrues." 28 U.S.C. § 2501.  This statute of limitations is an explicit condition of the Government's waiver of sovereign immunity and, as a matter of law, jurisdictional.  *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008) (holding that the six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims).

The United States Court of Appeals for the Federal Circuit has held that a Takings Clause claim accrues when "all events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence."  *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988).  But, "in cases where the government leaves the taking of property *to a gradual physical process*, rather than utilizing the traditional condemnation procedure, determining the exact moment of claim accrual is difficult."  *Boiling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000) (emphasis added).  In those cases, the United States Supreme Court has held that "the [property] owner is not required to resort[,] either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.'"  *United States v. Dickinson*, 331 U.S. 745, 749 (1947).  Instead, an owner's Takings Clause claim accrues when the situation has "stabilized" and "clear that the gradual process set into motion by the government has effected a permanent taking" and "the extent of the damage is reasonably foreseeable."  *Boiling*, 220 F.3d at 1370–71 (citing *Dickinson*, 331 U.S. at 749).

The gravamen of the September 29, 2014 Complaint is that the Army Corps repeatedly promised to remove accreted sand on Plaintiff's property, as part of the Sea Gate Project to mitigate a condition caused, in part, by the Army Corp's prior undertaking at Coney Island.  The Sea Gate project was delayed because of issues regarding congressional funding,[3] New York State government approval, and the failure of some residents to provide the Army Corps with easements, so the accreted sand could be removed.[4]  All of these factors rendered the permanency and extent of the Takings Clause claim, as alleged in the September 29, 2014 Complaint, uncertain.  The United States Court of Appeals for the Federal Circuit has held that the stabilization doctrine is invoked where "a series of distinct events [are] pleaded to the court as a single overall event spanning many years."  *Applegate v. United States*, 25 F.3d 1579, 1583 (Fed. Cir. 1994); *see also Banks v. United States*, 314 F.3d 1304, 1309 (Fed. Cir. 2003) ("[T]he question is whether the predictability [and permanence] of the extent of damage to the [plaintiff's] land was made justifiably uncertain by the Corps' mitigation efforts.") (internal quotation marks omitted); *see also Mildenberger v. United States*, 643 F.3d 938, 946 (Fed. Cir. 2011) ("[t]he obligation to sue arises once the permanent nature of the Government action is evident, regardless of whether damages are complete and fully calculable.").

[3] Plaintiff proffered a June 2014 brochure reciting a brief history of the Sea Gate Project that indicates the Army Corps did not commence work on the Sea Gate Project until 2014, because of a delay in funding.  Sea Gate Brochure at 2; *see also* 10/17/16 Breslof Aff. at 1.

[4] 5/25/16 Prakhin Dep. at 106–07 ("Q: Do you remember ever being approached about providing a right of entry[?]  A: Yes, I do remember I been approached by some of the board representatives and I gave permission to remove the sand.")

To establish that the September 29, 2014 Complaint is not barred by the six year statute of limitations, Plaintiff proffered an October 17, 2016 Affidavit from Stephen M. Breslof, the former Treasurer and President of the Sea Gate Association, who recalled the relevant events as follows:

> During the many years of my tenure in these positions, I had numerous meetings and discussions with representatives of the [Army Corps], including specifically with Anthony Ciorra, who was the Project Manager for the Coney Island/Sea Gate Project at that time. Some of these discussions/meetings included representative from the State and City of New York, and from the Office of Congressman Nadler.

> During these discussions and meetings, I raised the concerns of the residents of Sea Gate, especially those who live along Ocean View Avenue on the Gravesend Bay side of Sea Gate, about the recurring build up of sand along the beach, including up to and spilling over the bulkhead along resident's private properties. This build up of sand would even blow right onto their yards, and onto the streets. For years after the work done by the Army Corps of Engineers on the W. 37th terminal groin was completed, the sand from the Sea Gate Beach would erode and shift and blow to the north side of Sea Gate to the Gravesend Bay side of Sea Gate as I described herein.

> *Repeatedly over the years, Mr. Ciorra [the Chief of Coastal Restoration and Special Projects Branch of the Army Corps] and others from the Army Corps [] assured me that they were well aware of the sand shifting problem for Sea Gate, and that they were working on finding both temporary and long-term solutions. They also told me that they were trying to obtain the necessary government funds to pay for the work needed to remove the sand and rectify the situation, but that would take some time.*

> *It was always my understanding, based on the conversations I had with Mr. Ciorra and the other representatives from the Army Corps, and other state and city representatives, that all the sand that had accumulated on the Gravesend Bay Side of Sea Gate would all be removed, and that side of Sea Gate would eventually be restored to the condition it was in prior to the original work done in 1994/95 as the Coney Island Project.*

10/17/16 Breslof Aff. at 1 (emphasis added).

Plaintiff also proffered the May 25, 2016 deposition of Yuriy Prakin, who testified that the Army Corps promised to remove accreted sand from his property:

Q: Do you remember what the Sea Gate Association said at that point?

A: [PRAKHIN] Yes, I do remember. At that point and further points, they said that the Army Corps of Engineers took the responsibility for this issue and they promise to correct the current situation to return the land as this land was before this problem.

Q: Did you ever reach out to the Army Corps of Engineers?

A:  [PRAKHIN]  No.

Q:  Have you ever spoken with anyone from the Army Corp of Engineers?

A:  [PRAKHIN]  Not me particularly.  But there are several meetings during this time.  There are several meetings with the Sea Gate Association and a couple of them, somebody from Army Corps of Engineers were present.  And the question - - they answered questions that was asked by the homeowners.

5/25/16 Prakhin Dep. at 30.

\*        \*        \*

Q:  On page 1, on the first request for admission, you deny that the United States has never promised, planned, or promised to remove any amount of sand from your property.

A:  [PRAKHIN]  Yes.

Q:  What is that denial based on?

A:  [PRAKHIN]  Based upon the fact that the Army Corps pretended to fix the situation and they started big project initiating removal of the sand from the beach. The beach, when I say beach, beach in front of my property, neighbor's property, and there were probably hundreds of big machinery.  So therefore, I cannot read the fact that they never started to do something.  And another question about promises, I personally heard the promises from the Army Corps of Engineers representatives during those meetings with Sea Gate Association.

5/25/16 Prakhin Dep. at 49–50.

\*        \*        \*

Q:  What was that promise?

A:  [PRAKHIN]  They said the last conversation with the Army Corps representative was in 2013.  It was a meeting, a general meeting of Sea Gate Association.

5/25/16 Prakhin Dep. at 54.

\*        \*        \*

Q:  During all of these meetings with the Army Corps of Engineers, did the Corps say they would possibly remove the sand from your property or they were going to remove the sand from your property?

A:  [PRAKHIN]  No, they said they definitely will cure the issue, including removal of the sand.

5/25/16 Prakhin Dep. at 90.

\*        \*        \*

Q:  Does this letter mention at all removing sand from the Gravesend Bay area?

A:  [PRAKHIN]  This is what it says.  If you want me to read it, the most recent promises which began with an expected project *last summer again* through the *fall and in January* have not been kept.  What I see that the project means, the correction of the Sea Gate beaches, not only part of the beach, I think it's pertaining to all of the situation in Sea Gate.

5/25/16 Prakhin Dep. at 94 (emphasis added).

*        *        *

Q:  The first sentence of the second paragraph says:  "The Corps, the federal agency responsible for maintaining the nation's shores and navigation channels, wants to restore the level of sand at the Sea Gate beach to the way it was 15 years ago."

A:  [PRAKHIN]  Yes.

Q:  Is this consistent?

A:  [PRAKHIN]  This is the promise which was delivered to us.  I'm not sure whether it was delivered close to when this letter was issued.  However, as I said before, it was delivered to us during all this period since '96 up to 2013, the same promise or approximately the same promise which was delivered to us at this time.

Q:  You said this was the same promise.  It looks like this is saying that the Corps wants to restore the level of sand at the Sea Gate beach to the way it was 15 years ago?

A:  [PRAKHIN]  Okay.

5/25/16 Prakhin Dep. at 126–27.

*        *        *

Q:  And from what I've heard, the basis of your belief that the government was planning to remove sand from your property was the meetings that you attended?

A:  [PRAKHIN]  Yes.

Q:  Anything else?

A:  [PRAKHIN]  Explicit promises by the officials from Army Corps of Engineers, and basically that's all.

5/25/16 Prakhin Dep. at 160–61.

*        *        *

A:  [PRAKHIN]  In one of the exhibits which we just marked, there are some documents or some articles which said that the sand is going to be removed or should be removed or promised to be removed.  Whether it says all of the sand, part of the sand, 75 percent, I assume if something is supposed to be removed, something is supposed to be 100 percent removal.  This is how I understand it.  If they contemplated part of the sand, 50 percent of the sand, it should be in writing.

If the promise or article said the sand going to be removed, it means all the sand. At least for me.

5/25/16 Prakhin Dep. at 178.

In addition, Plaintiff also proffered three articles published on the Army Corps' website, reporting that the Sea Gate Project "includes the placement of roughly 125,000 cubic yards of sand [on Sea Gate's private and public beaches], *with sand coming from the Gravesend Bay side of Sea Gate*[,] as well as dredged from the Rockaway Inlet[.]"  Army Corps Articles at 1 (emphasis added).  These articles discuss that the Sea Gate Project was considered by the Army Corps as "a long-term solution to the beach erosion *and sand accumulation problems that have occurred . . . within the Sea Gate Community*[,]" and, "[t]he project was authorized to provide a long-term solution to the beach erosion **and sand accumulation that have occurred [in the Sea Gate Community]**."  Army Corps Articles at 5 (emphasis and bold added).

In rebuttal, the Government proffered the April 26, 2016 Deposition of Anthony Ciorra, Chief of the Coastal Restoration and Special Projects Branch for the Army Corps, New York District.  5/26/16 at 5.  The following testimony is relevant to the issue of accrual

Q:  Do you recall ever telling any of the [Sea Gate] board members at any meeting or otherwise that the Army Corps of Engineers was going to remove sand from the Gravesend Bay beach and use it to replenish the south side beach?

A:  [CIORRA]  Yes, whenever we briefed the community on the recommended plan, we included the component that *there would be some sand taken from Gravesend shoreline to fill the T-groin compartments on the ocean front*.

5/26/16 Ciorra Dep. at 74 (emphasis added).

\*     \*     \*

Q:  Okay.  ***So does that mean that Mr. Prakhin's property was amongst the proposed properties for sand removal by the Army Corps?***

A:  [CIORRA]  ***Proposed, yes***.

5/26/16 Ciorra Dep. at 132–33 (emphasis and bold added).

\*     \*     \*

Q:  This is a solicitation for bid?

A:  [CIORRA]  It's a pre-solicitation. It's called an advanced notice to bidders that plans and specs may be released shortly for solicitation for bid.

Q:  Does this solicit a bid for the excavation of excess sand and removal of debris on the Gravesend Bay side of Sea Gate?

A:  [CIORRA]  Yes.

Q:  And when was this, do you know - - oh, it says date published January 4, 1999.  Do you know if that was the intention of the Army Corps was to remove not only the sand but also timber and debris and sand fencing [on private property]?

A:  Yes, absolutely.  Yes, that was the intent.

Q:  [CIORRA]  And where would that timber, debris, and sand fencing be in terms of on the beach?

A:  [CIORRA]  In the area of Beach 38 - - I'm sorry, it would be in the area of the excavated sand along Norton Point and Gravesend Bay shoreline.

Q:  Does that encompass the area that we talked about earlier where the specific properties were listed that would be affected?

A:  [CIORRA]  Yes.

5/26/16 Ciorra Dep. at 140–41.

        *        *        *

Q:  And post Hurricaine[sic] Sandy, did the Army Corps' general plans for the beach at Sea Gate, the Gravesend Bay beach and the ocean side beach change at all due to Hurricaine[sic] Sandy?

A:  [CIORRA]  They changed but not necessarily due to Hurricaine[sic] Sandy. They changed when we had more detailed information, you know, changed conditions.

Q:  Such as?

A:  [CIORRA]  We had a design from the report, but when we went through some analysis, detail design analysis, call it value engineering, where we look at ways to try to reduce cost without sacrificing effectiveness and efficiency, there were some slight design changes.

Q:  What were those changes?

A:  [CIORRA]  One could have been instead of a rock stem, we went with sheet pile stem.  I may have mentioned that earlier.

Q:  What were any [other] details[,] if any[,] related to the removal of the sand accumulation in Gravesend Bay?

A:  [CIORRA]  No significant changes I'm aware of.  **_We still proposed to use the Gravesend Bay area as a borrow source of sand_** for the T-groin compartments once they were constructed.

Q:  Did the portion of the Gravesend Bay as a borrow source change at all after Hurricaine[sic] Sandy?

A:  [CIORRA]  It changed only in that _it was dependent upon, once again, those properties where we could acquire signed easements from the property owners_. **_Not all the property owners were willing to sign easements_**.

10/17/16 Ciorra Dep. at 156–58 (emphasis and bold added).

        *        *        *

Q:  I'm showing you Exhibit 43.  It's a letter dated July 2nd, 2003 from Roman Rockozy[, Representative of New York State Department of Environmental Conservation] to you.  Do you recognize this letter?

A:  [CIORRA]  Yes.

Q:  What is the sum and substance of this letter?

A:  [CIORRA]  This was the response to the draft limit reevaluation report.  It's a letter from the State of New York indicating their support for the recommended plan.

Q:  The last sentence says:  "The state has allowed the material to remain to date with the understanding the sand be removed at the time of the construction of the T-groins."  What does that mean?

A:  [CIORRA]  *That means the state wanted any plan* for the T-groins *to include the associated removal of sand from Gravesend Bay* to fill the compartments.  During the final plans, of course we complied with that request and ultimately the state did issue the permit for the project.

Q:  Do you know if there was any document, any letter, any memo, anything like that that specified where on the Gravesend Bay beach the sand must be removed from?

A:  [CIORRA] No, it basically outlined the potential location for the removal from Norton Point around Sea Gate to the east to the property lines to the end of the eastern boundary of Sea Gate.

Q:  Did anyone from the State or the City of New York say anything to you either verbally or in written communication, an e-mail, a document, a memo, anything with regard to what part of the Gravesend beach the sand was to be moved from?  I don't mean which section but I mean the bulkhead versus the shoreline or some other part.

A:  [CIORRA]  That wasn't specified.

Q:  ***Just in general that it be removed from the Gravesend Bay beach?***

A:  [CIORRA]  ***As much as practical.***

5/26/16 Ciorra Dep. at 177–79 (emphasis and bold added).

*        *        *

Q:  And[,] was this document [Exhibit 43, dated July 2, 2003], . . . *made available to the Sea Gate Association?*

A:  [CIORRA]  It was.

Q:  Okay.  Was it read by [the Sea Gate Association] and approved by [the Sea Gate Association] prior to the start of the work?

A:  [CIORRA]  Yes.

Q:  Do you know if [Specifications for the 2004 Sand Removal Operation] was made available to any of the homeowners?

A:  [CIORRA]  This document?

Q:  Yeah.

A:  [CIORRA]  *It would have been [only] to the homeowners who signed the rights of entry, yes.*

5/26/16 Ciorra Dep. at 184 (emphasis added).

But, during Mr. Ciorra's subsequent August 26, 2016 Declaration, he appeared to partially retract and qualify his prior sworn testimony, stating:

During . . . meetings [with the Sea Gate Association], the only discussion regarding the accumulated sand was with regards to using *some unspecified and unknown amount* of the accumulated sand to help mitigate the erosion of Sea Gate Beach.

***At no point . . . did the [Army] Corps promise to remove all the accumulated sand from Gravesend Bay*.** . . . Because, the accumulated sand was only needed to mitigate the erosion of Sea Gate Beach, it was never contemplated that all the accumulated sand would be removed.

8/26/16 Ciorra Decl. at ¶ 5–6 (emphasis and bold added).

Accordingly, the court has determined that the Government failed to rebut the collective evidence proffered by Plaintiff that the Army Corps promised to remove sand from Plaintiff's property, and that the nature of the Army Corps' communication with the residents of the Sea Gate Community rendered accrual of Plaintiff's claim "justifiably uncertain." *See Applegate*, 25 F.3d at 1583 (holding that a claim does not accrue, where "Government's promises . . . have destroyed any predictability of the extent of damage to the land."); *see also Banks*, 314 F.3d at 1309 (the relevant inquiry regarding the doctrine of "justifiable uncertainty," is whether the Army Corps' promises made "the predictability [and permanence] of the extent of damage to the [plaintiffs'] land . . . justifiably uncertain") (internal quotation marks omitted).

For these reasons, the court has determined that Plaintiff established, by a preponderance of the evidence,[5] that the Takings Clause claim, alleged by the September 29, 2014 Complaint, did not accrue until the Army Corps completed the Sea Gate Project on June 13, 2016, without removing the accreted sand on Plaintiff's property.  10/17/16 Ciorra Dep at 165; Army Corps Articles at 3.  Accordingly, the statute of limitation does not bar the court from adjudicating the Takings Clause claim, as alleged in the September 29, 2014 Complaint.  *See Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009) ("A claim first accrues when ***all the events have***

---

[5] "Preponderance of the evidence, with respect to the burden of proof in civil . . . actions such as this one, means the greater weight of evidence, evidence which is more convincing than the evidence which is offered in opposition to it."  *Hale v. Dep't of Transp., F.A.A.*, 772 F.2d 882, 885 (Fed. Cir. 1985).

***occurred that fix the alleged liability*** of the government and entitle the claimant to institute an action.") (emphasis and bold added).

Of course, as a matter of law, Plaintiff cannot establish a permanent physical taking, unless the amount of sand on his property impairs its use or effectively destroys it. *See Pumpelly v. G.B. & M. Canal Co.*, 80 U.S. 166, 181 (1871) (holding that where real estate is actually invaded by super induced additions of water, earth, sand or other material, or by having any artificial structure placed on it, *so as to effectually destroy or impair its usefulness*, it is a taking, within the meaning of the Constitution); *see also Coates v. United States*, 93 F. Supp. 637, 639 (Ct. Cl. 1950) (same). Whether that is the case is an issue for another day.

## IV.    CONCLUSION.

For these reasons, the Government's August 29, 2016 Renewed Motion To Dismiss is denied. *See* RCFC 12(b)(1).

The court will convene a telephone status conference, at the earliest date convenient to the parties, to establish a discovery schedule and set this case for trial.

**IT IS SO ORDERED.**

*s/ Susan G. Braden*
**SUSAN G. BRADEN**,
**Chief Judge**.