# In the United States Court of Federal Claims

No. 14-924L
(Filed: March 10, 2023)
**FOR PUBLICATION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| YURIY PRAKHIN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Anna C. Broxmeyer*, Law Office of Yuriy Prakhin, P.C., Brooklyn, NY, for Plaintiff. With her on briefs was *Gil Zohar*, Law Office of Yuriy Prakhin, P.C., Brooklyn, NY.

*Dustin J. Weisman*, Trial Attorney, Natural Resources Section, United States Department of Justice, Denver, CO, for Defendant, United States. With him on briefs were *Matthew P. Rand*, Trial Attorney, Natural Resources Section, United States Department of Justice, Denver, CO, *Todd Kim*, Assistant Attorney General, Environment & Natural Resources Division, as well as *Charles W. Johnson*, Counsel, U.S. Army Corps of Engineers, New York District.

## OPINION AND ORDER

The parties have filed two motions in anticipation of trial in this matter. Plaintiff Yuriy Prakhin filed a motion *in limine* to preclude expert testimony by Charles Caramanna,[1] and the government filed a motion *in limine* to exclude certain exhibits and fact witnesses.[2] I have heard oral argument.[3] For the reasons discussed below, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

---

[1] Pl.'s Mot. in Lim. to Preclude Testimony by Charles Caramanna ("Pl.'s Mot.") (ECF 113); *see also* Def.'s Resp. (ECF 119); Pl.'s Reply (ECF 121).
[2] Def.'s Mot. in Lim. to Preclude Undisclosed Exhibits & Fact Witnesses ("Def.'s Mot.") (ECF 114); *see also* Pl.'s Resp. (ECF 118); Def.'s Reply (ECF 123).
[3] Tr. of Oral Arg. ("Tr.") (ECF 128).

**DISCUSSION**

I. **Plaintiff's Motion to Exclude Expert Testimony**

Plaintiff has title to a parcel of property, Lot 5, in Brooklyn, New York, and he may have title to another parcel of property, Lot 105, adjacent to the northern boundary line of Lot 5. *See* Joint Stipulation of Facts at 1 ¶ 2–3, 4 ¶ 13, 5 ¶ 17 (ECF 112); Expert Report of Charles Caramanna, Pl.'s Ex. A ("Expert Report") at 4 (ECF 113-1).[4] Lot 105 lies along the beach. Lot 5, where his house is located, is immediately inland from Lot 105. The two parcels are separated by a barrier intended to prevent sand from reaching Lot 5. *See* Expert Report at 5. Sand collects on the beach adjoining Plaintiff's property because of construction by the Army Corps of Engineers, then accumulates on Lot 5 and Lot 105. Plaintiff alleges that the sand accumulation constitutes a taking of property that must be compensated under the Fifth Amendment. Compl. at 1–2.

The parties have informed the Court that because they agree the sand intrusion on Plaintiff's property constitutes a Fifth Amendment taking, *see* Stipulation Regarding Taking/Liability (ECF 71), trial is likely to center on computing the compensation to which Plaintiff is entitled. The government has offered Mr. Caramanna as an expert on the cost to cure the sand intrusion, one measure of damages that might apply. *See, e.g.*, *Vaizburd v. United States,* 384 F.3d 1278, 1285–86 (Fed. Cir. 2004). Plaintiff takes issue with Mr. Caramanna's expertise, data, and methods.

A. **Mr. Caramanna's opinions**

Mr. Caramanna is a licensed engineer. His academic training emphasized both structural engineering and geotechnical engineering, an engineering field covering "the behavior of soils." Depo. at 8 (ECF 113-2). He also testified to experience in coastal construction, including jetties, seawalls, bulkheads, bridges, and beach restoration. *Id*. at 55. Mr. Caramanna was hired to estimate three costs: (1) annual removal of sand from Lot 5 and Lot 105, (2) construction of measures necessary to remediate or reduce sand accumulation, and (3) one-time removal of sand and other remediation on Lot 5. *Id*. at 48–49.

To reach those estimates, Mr. Caramanna first considered what makes sand encroach on Plaintiff's property. *Id*. at 96 (explaining that he needed to determine the cause before developing a cure). The sand accumulation is seasonal in the winter and

---

[4] Plaintiff's evidence is contained in seven exhibits (Exhibits A–G) attached to his motion. Since Plaintiff combined Mr. Caramanna's expert report and rebuttal report as Exhibit A, this Order relies on the electronic filing system's pagination.

spring. *Id.* at 104. Mr. Caramanna visited Plaintiff's property in February and determined that because of the length of the beach separating Plaintiff's property from the water, the sand must reach the property by wind. *Id.* at 36, 54; Expert Report at 8. Because wind-driven sand accumulation is proportional to the size of the beach, Expert Report at 8, Mr. Caramanna estimated how much the size of the beach varies. He did not enter the water and he acknowledged that his estimate had some inherent uncertainty, but he did not think the margin of error cast doubt on his conclusions. He found the overall size of the beach was consistent in aerial photographs, even over a period when hurricanes passed over the beach. Depo. at 58–59, 66–67, 102–03; *see also id.* at 62 (describing his experience interpreting aerial photography).

His next step was to estimate the accumulated sand's volume. Mr. Caramanna discounted several pictures of sand accumulation because he concluded the pictures showed water-driven sand that accumulated after major storms, not wind-driven sand attributable to excess sand on Plaintiff's beach. *Id.* at 76–78, 86, 114–17. Instead, he aimed to estimate sand volume from his personal observations.

The sand collects in a dune that grows higher over Lot 105, forming a ridge in front of the barrier between Lot 5 and Lot 105. *See* Expert Report at 11–12. The dune is irregular in shape, and it varies in its exact size and position. *See id.* at 9. Mr. Caramanna determined the approximate length of the dune from the beach to the barrier, then the approximate height of the dune in front of the barrier. *Id.* at 11–12. He did not use any measuring devices. Depo. at 41–42. He measured horizontal distances by pacing, *id.* at 59, a method he testified is commonly used in his profession, and which he claims to use within the profession's accepted margin of error. *Id.* at 59–62. Mr. Caramanna converted those estimates of the dune's dimensions into a rough two-dimensional cross-section composed of straight lines and angles, and then into a three-dimensional volume by incorporating the width of Plaintiff's property line along the beach. *See* Expert Report at 12.

Mr. Caramanna then used that volume to estimate the fixed and recurring costs of mitigating the accumulation. He has personal experience with cost estimation, Depo. at 27–28, a subject the parties agree is within his expertise, Tr. at 5. In this case, he relied on two assistants who are familiar with RSMeans, Depo. at 27, 29, which he describes as a nationally recognized source for construction cost estimation, *see* Expert Report at 11. One assistant's specialty is RSMeans software; the other's is the hard copy version of RSMeans data. Depo. at 30. Mr. Caramanna provided his assistants with his estimate of sand volume and the requirements for equipment and labor, and they used RSMeans to generate a cost estimate.

Mr. Caramanna and his assistants used RSMeans to estimate the cost of two proposed mitigation solutions. First, Mr. Caramanna proposed building a new tempered-glass barrier to prevent sand accumulation on Lot 5. Expert Report at 10. He provided his assistants with the proposed new barrier's specifications, and they used RSMeans to develop a cost estimate. Depo. at 30. Second, Mr. Caramanna used RSMeans to estimate the annual cost of removing the accumulated sand. Expert Report at 13.

Mr. Caramanna opined that his proposal would prevent sand from accumulating in Lot 5. Depo. at 75–76. Nonetheless, in response to a contention from Plaintiff's expert that sand on Lot 5 would need to be removed one way or another, Mr. Caramanna determined the equipment and labor requirements for vacuum truck removal, then had one of his assistants use RSMeans to estimate the cost. Expert Report at 48; Depo. at 72–73, 132–34.

### B. Analysis

The government intends for Mr. Caramanna to offer opinions as an expert. For Mr. Caramanna to do so, he must satisfy the requirements of Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The burden is on the party proffering expert opinion to show that those requirements are met by a preponderance of evidence. *Spectre Corp. v. United States*, 160 Fed. Cl. 486, 492 (2022) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)); *GASA, Inc. v. United States*, 88 Fed. Cl. 752, 755 (2009); *Dairyland Power Co-op v. United States*, No. 04-106C, 2008 WL 5122339, at *11 (Fed. Cl. June 20, 2008). Plaintiff objects, first, that Mr. Caramanna does not have the necessary expertise to testify to

his opinions, and second, that his opinions are not based on sufficient data or reliable methods. On the present record, those objections are meritless.[5]

As to Mr. Caramanna's expertise, the parties have stipulated that Mr. Caramanna is an expert engineer and cost estimator. Tr. at 5. Plaintiff contends that Mr. Caramanna has gone beyond that expertise in testifying about sand movement. Contrary to Plaintiff's argument, Mr. Caramanna's opinions appear to be well within the expertise of an engineer familiar with coastal construction.

To the extent expertise in the causes, mechanisms, and dynamics of sand movement might have been relevant to Mr. Caramanna's opinions,[6] the key seems to have been Mr. Caramanna's ability to distinguish between wind- and water-transported sand. As he explained, he needed to determine the cause of sand accumulation before he could propose a solution. Depo. at 96. Doing so meant making his own observations as well as interpreting photographs of sand on Plaintiff's property. Mr. Caramanna believed the sand he observed was wind-driven, Expert Report at 9, and discounted evidence of what he believed to be storm-driven sand, *id.* at 8; 37–38. Mr. Caramanna described the sand characteristics that led him to his opinions, *id.* at 8–9, testifying that he was able to distinguish between sand driven in different ways because of his experience in coastal engineering. Depo. at 86–87, 89–90.

Experience is a valid basis for expert opinion. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also, e.g.*, *Banks v. United States*, 75 Fed. Cl. 294, 297, 300 (2007); Fed. R. Evid. 702, advisory committee's note to the 2000 Amendments ("Nothing in this amendment is intended to suggest that experience alone … may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."). Although Mr. Caramanna does not have any specialized training in how wind moves sand, Depo. at 31–32, such training seems unnecessary

---

[5] Mr. Caramanna will have to establish the admissibility of his testimony on the record at trial. *See Cummins v. Lyle Ind.*, 93 F.3d 362 (7th Cir. 1996) (holding that the district court properly excluded expert testimony at trial even though it denied a pretrial motion to exclude the expert testimony); *see also* Fed. R. Evid. 103, advisory committee's note to 2000 Amendment ("Even where the court's ruling is definitive, nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered."); *Highland Capital Mgmt. L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (quoting *Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.,* No. 01 Civ. 3796, 2005 WL 1026515, at *3 (S.D.N.Y. May 2, 2005) (itself citing *Luce v. United States*, 469 U.S. 38, 41–42 (1984))).

[6] The parties agreed on the seasonality of sand accumulation, and Plaintiff does not contest that Mr. Caramanna inspected at a time of year when accumulation was at its peak. Given that, it is not clear what else Plaintiff thinks Mr. Caramanna needed to know about the mechanics of sand movement in the first place.

in light of Mr. Caramanna's experience building on the coast. At a minimum, Plaintiff has failed to explain why Mr. Caramanna's experience is inadequate for him to reach his opinion about how sand reaches Plaintiff's property.

Plaintiff objects that Mr. Caramanna lacks expertise in various academic fields such as meteorology, climatology, and oceanology. Pl.'s Mot. at 8. But the question is simply whether Mr. Caramanna is qualified to offer his opinions under Rule 702, not whether he has maximized his formal training. *See Dairyland Power*, 2008 WL 5122339, at *10; *United States v. Roach*, 644 F.3d 763, 764 (8th Cir. 2011) ("Rule 702 does not rank academic training over demonstrated practical experience."); *Waldorf v. Shuta*, 142 F.3d 601, 626 (3d Cir. 1988) ("[I]n considering the qualification of witnesses as experts, we stress that ordinarily an otherwise qualified witness is not disqualified merely because of a lack of academic training."). Plaintiff does not explain how the supposedly missing areas of expertise bear on the helpfulness of Mr. Caramanna's knowledge or his ability to identify and measure wind-driven sand. *See* Fed. R. Evid. 702(a). The supposedly omitted subjects are therefore irrelevant to his qualifications.

Plaintiff similarly lists a series of factual areas on which Mr. Caramanna lacks expertise: "calculating future movement of sand," "calculat[ing] the movement of sand within the water," "estimat[ing] … the movement of sand … within the water," "the natural steady state of the beach," "the daily current movement and tide change," "the energy of the wind," and "transportation of significant volumes of sand[.]" Pl.'s Mot. at 14. But those too are only distractions and red herrings, for (except as to wind transportation of sand, discussed above) Mr. Caramanna does not purport to opine on any of those matters in the first place: He predicted annual accumulation of the sand he observed, then opined on how to mitigate it. Plaintiff again fails to explain why any of those subjects is a necessary predicate for the opinions Mr. Caramanna has actually reached, given Mr. Caramanna's methods. *See, e.g., Murfam Farms, LLC v. United States*, Nos. 06-245T, 06-246T, 06-247T, 2008 WL 4725468, at *3 (Fed. Cl. Sept. 19, 2008) (rejecting a party's objection to an expert witness's qualifications regarding audit procedures because such expertise was not relevant to the expert's reported opinion).

Plaintiff also objects to Mr. Caramanna's data and methods. As explained above, Mr. Caramanna's methods were fairly straightforward. He determined that the sand was wind-driven, and that because the beach size was stable the annual sand accumulation likely would be as well. He then estimated the width, length, and height of the dune, which generated a volume of sand. That in turn led to a recommendation about the labor needed to remove it and a barrier sufficient to

control it. His assistants then used that recommendation to prepare pricing. Plaintiff argues that several aspects of Mr. Caramanna's process were defective.

First, Plaintiff objects to Mr. Caramanna's methods for measuring the sand dune. Plaintiff claims that "no actual measurement or survey was conducted," Pl.'s Mot. at 6, but that is inaccurate hyperbole. Mr. Caramanna *did* conduct a survey that measured the dimensions of the sand dune; Plaintiff just does not like the way he did it.

And what exactly was wrong with Mr. Caramanna's measurement method? The width of the dune is the same as Plaintiff's property line. Its length, Mr. Caramanna measured by pacing. Plaintiff objects about possible errors in pacing, but Mr. Caramanna testified to his own error rate and to the industry standard of care, Depo. at 60–61, and Plaintiff has presented no evidence to the contrary. *See* Fed. R. Evid. 703 (expert may base his opinion on facts and data "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject"). The dune's overall height would presumably be within the "rational[] … perception" of even a lay witness. Fed. R. Evid. 701; *see also Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995). Given that those three dimensions mathematically combine into a volume — and that Plaintiff has not contradicted Mr. Caramanna's volume calculation, given his dimension estimates — the method of determining volume seems to be reliable and based on sufficient facts or data. *See* Fed. R. Evid. 702(b)–(c).

Mr. Caramanna conceded that his volume calculation was an estimate, Depo. at 60; Expert Report at 12, but Plaintiff exaggerates the significance of the admission. Mr. Caramanna seems to have meant that it is impossible to do *more* than estimate sand volume — an intuitively plausible point that Plaintiff has not seriously tried to contradict. Facts and data can be "sufficient" for purposes of Rule 702(b) even if they are estimates not susceptible to precise measurement. *See Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 830 (D. Minn. 2011).

To the extent Plaintiff believes Mr. Caramanna should have used instruments or other methods to take measurements, Plaintiff generally does not explain exactly what Mr. Caramanna should have done or what tools he should have used, let alone how omitting those methods rendered Mr. Caramanna's data insufficient or his methods unreliable. Fed. R. Evid. 702(b)–(c). Plaintiff's sole specific objection is that Mr. Caramanna's aerial photographs of the beach did not include scale markings. Pl.'s Mot. at 9. But of course Plaintiff's property has known dimensions, and Mr. Caramanna seems to have derived his scale from that. Depo. at 69. Even as to the

photographs, the exact distances were less important to Mr. Caramanna than the overall shape and size of the beach, making more precise measurement unnecessary.

Second, Plaintiff objects to Mr. Caramanna's methods for estimating remediation costs. Plaintiff does not argue that RSMeans is an unreliable source for pricing, nor that Mr. Caramanna or his assistants used it incorrectly. Instead, Plaintiff seems to object that Mr. Caramanna relied on his assistants to use RSMeans in the first place. Plaintiff cites no authority supporting an objection under circumstances like these. That objection, in fact, is squarely foreclosed by precedent. *See Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 592 (1993); *Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir. 2008); *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94–95 (2d Cir. 2000); *City of Wilmington v. United States*, 152 Fed. Cl. 373, 382–83 (2021); *Okerlund v. United States*, 53 Fed. Cl. 341, 346–47 (2002); *Chen-Oster v. Goldman, Sachs & Co.*, No. 10-Civ-6950, 2022 WL 814074, at *15 (S.D.N.Y. 2022).

Plaintiff similarly objects to Mr. Caramanna's estimate for the price of vacuum truck sand removal because it is much lower than an estimate Plaintiff obtained from a local company. Pl.'s Mot. at 12–13. Mr. Caramanna reached that estimate, though, in the same way he reached his other estimates, *i.e.*, by having an assistant use RSMeans to calculate the price of a job that Mr. Caramanna described. *See* Handwritten Notes of Charles Caramanna, Pl.'s Ex. F (ECF 113-6). The difference between RSMeans and the estimate Plaintiff obtained cannot be enough by itself to show that Mr. Caramanna's methods or data are unreliable. *See Daubert,* 509 U.S. at 595 ("The focus ... must be solely on principles and methodology, not on the conclusions that they generate."); *Kenney v. Watts Regulator Co.*, 512 F. Supp. 3d 565, 582 (E.D. Pa. 2021). Plaintiff's estimate could just as easily be too high. Which estimate is more accurate can be determined at trial.

Plaintiff raises a flurry of additional objections, none of which has any merit. Plaintiff objects that Mr. Caramanna does not know enough about movement of sand in water or about whether sand will accumulate on Plaintiff's property in perpetuity, Pl.'s Mot. at 9, but that does not appear relevant to the analysis. Mr. Caramanna's cost estimation could be interpreted to assume that Plaintiff and his experts are correct in anticipating future sand accumulation. If Mr. Caramanna is right that Plaintiff's beach is stable and the sand on Plaintiff's property is wind-driven, analysis of how sand reaches the beach by water would have had no purpose.

Plaintiff argues that Mr. Caramanna should not have used Wikipedia (an open-source web-based encyclopedia) as a reference for storms affecting New York beaches, arguing that more authoritative lists are available elsewhere. Pl.'s Mot. at 10. "Wikipedia is a suspect authority, unreliable, and has been treated as such by

numerous courts." *Specter v. Texas Turbine Conversions, Inc.*, 505 F. Supp. 3d 936, 954 (D. Alaska 2020) (collecting cases). But Plaintiff seems mistaken to characterize Mr. Caramanna's opinions as relying on the details of the Wikipedia list in any significant way.

Mr. Caramanna's opinions may have rested on the fact that large storms had *occurred*. He noted, for example, that the beach at Plaintiff's property was stable despite the storms. Expert Report at 7–8. He also discounted certain undated pictures as depicting storm-driven sand, *id.* at 38, which would have been implausible if no storms large enough to drive large amounts of sand had taken place. But none of that depends on the particulars of any given storm.[7] Even if the Wikipedia list contains inaccuracies as to the exact number, date, and intensity of the storms — though Plaintiff points to none — those details seem irrelevant to Mr. Caramanna's opinions.

Plaintiff criticizes Mr. Caramanna for discounting Plaintiff's own claims about the frequency and extent of his sand removal efforts. Pl.'s Mot. at 11. Mr. Caramanna explained that Plaintiff lacked documentation for sand removal expenses, and he seems to suspect that Plaintiff is exaggerating his expenses in litigation. Expert Report at 42. Plaintiff argues that is improper. But although witness credibility is solely the province of the trier of fact, *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 856 (1982), there is nothing impermissible — or even unusual — about experts sorting through masses of contradictory materials and choosing to rely on some but not others. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003). That is part of how all experts form opinions; it does not exceed Mr. Caramanna's role or interfere with the Court's. Whether Mr. Caramanna was justified in his skepticism about Plaintiff's assertions can be resolved at trial.

Plaintiff objects that Mr. Caramanna's conclusion does not include sand removal on Lot 5. Pl.'s Mot. at 12. But that omission, if it can even be called that, is a function of his conclusion that the remedial measures he proposes would prevent sand from accumulating on Lot 5 at all. Expert Report at 11–13. Plaintiff can cross examine Mr. Caramanna on that conclusion at trial. At any rate Mr. Caramanna has also provided an estimate for vacuum removal.

Finally, Plaintiff takes issue with certain alleged errors in assumptions underlying Mr. Caramanna's opinions: for example, that Mr. Caramanna mistook tempered glass in Plaintiff's sand barrier for plexiglass, and that he did not know

---

[7] Contrary to Plaintiff's claims, no part of Mr. Caramanna's opinions seems to rest on attributing any given picture to the effects of any particular storm. Quite the opposite; Mr. Caramanna noted that the pictures were undated and therefore could not be lined up with any storms. Expert Report at 38 n.1. He relied, rather, on his interpretation of the images themselves.

enough about Plaintiff's lawn-care regimen when he noted limited evidence of sand damage on Plaintiff's grass. Pl.'s Mot. at 10–11. Those objections might go to Mr. Caramanna's credibility and the weight his opinions deserve,[8] but they do not show that Mr. Caramanna's data were insufficient for him to reach his opinions or that his methods were unreliable. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1183 (8th Cir. 1997); *Cook v. Rockwell Intern. Corp.*, 580 F. Supp. 2d 1071, 1092 (D. Colo. 2006).

Plaintiff's arguments for exclusion of Mr. Caramanna are, in short, unsupported by authority or the record. The motion is therefore denied.

## II. The Government's Motion to Exclude Exhibits and Witnesses

Fact discovery closed in July 2020, *see* Order (ECF 68), and expert discovery closed in August 2021, *see* Order (ECF 84). Yet when the parties exchanged pretrial lists of exhibits and witnesses on May 16, 2022, Plaintiff included several documents and witnesses that he had not previously disclosed. The government argues that those exhibits and witnesses should be excluded.

### A. Plaintiff's disclosure obligations

The parties' arguments center on Plaintiff's duty to disclose certain information, to respond to discovery requests, and — of most relevance — to supplement disclosures after they are made.

This Court's Rule 26(a) obligates parties to make initial disclosures "without awaiting a discovery request." RCFC 26(a)(1)(A). A party must disclose "the name and, if known, the address and telephone number of each individual likely to have discoverable information — along with the subjects of that information — that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment[.]" RCFC 26(a)(1)(A)(i). In addition, a party must disclose "a copy — or a description by category and location — of all documents, electronically stored information, and tangible things that [it] has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment[.]" RCFC 26(a)(1)(A)(ii). Separate from initial disclosures, parties must also respond to discovery requests, including requests for production of documents. *See* RCFC 34.

Parties have a continuing duty to supplement their disclosures and discovery responses. *See* RCFC 26(e). That duty applies even after discovery closes. *See, e.g.,*

---

[8] Mr. Caramanna seems to have referred to a receipt for plexiglass in his file. Depo. at 130–32. Plaintiff does not bring any evidence contradicting Mr. Caramanna's evaluation of the lawn. Mr. Caramanna seems to have found little evidence of sand removal or yard work. *Id.* at 118–19. Those are matters for examination on the merits.

*Dooley v. United States*, 577 F. Supp. 3d 229, 234 (S.D.N.Y. 2021); *Star Direct Telecom, Inc. v. Global Crossing Bandwidth, Inc.*, 272 F.R.D. 350, 358 (W.D.N.Y. 2011); *Wye Oak Technology, Inc. v. Republic of Iraq*, No. 1:10-cv-01182-RCL, 2018 WL 4623564, at *1 (D.D.C. Sep. 26, 2018); *Woods v. Google, Inc.*, No. C-11-01263-EJD, 2014 WL 1321007, at *4 (N.D. Cal. Mar. 28, 2014); *F.T.C. v. AMG Services, Inc.*, No. 2:12-cv-00536-GMN-VCF, 2014 WL 317781, at *6 (D. Nev. Jan. 28, 2014); *Cory v. Whisman, Grygiel & Giordano, P.A.*, No. WMN-06-2694, 2012 WL 1632729, at *6 (D. Md. May 8. 2012); *Episcopo v. General Motor Corp.*, No. 02-C-8675, 2004 WL 628243, at *7 (N.D. Ill. Mar. 29, 2004); *see also Widdoss v. Secretary of the Dep't of Health & Human Servs.*, 989 F.2d 1170, 1178 n.7 (Fed. Cir. 1993) ("[This Court] examine[s] general federal law interpreting the scope of the corresponding Federal Rules of Civil Procedure as persuasive."). If a party fails to make a timely disclosure, production, or supplement of additional documents or witnesses, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless[.]" RCFC 37(c)(1).

To complicate matters in this case, Appendix A to this Court's Rules contemplates that some disclosures of exhibits and witnesses might happen for the first time in pretrial lists. As to exhibits, the Rules provide that *"[u]nless previously exchanged*, counsel for the parties shall exchange a copy of each exhibit listed" in a pretrial exhibit list. RCFC App. A, R. 13(a) (emphasis added). As to witnesses, the Rules say that "[a]ny witness *whose identity has not been previously disclosed* shall be subject to discovery" when disclosed on a pretrial witness list. RCFC App. A, R. 13(b) (emphasis added).

Plaintiff argues that Appendix A effectively substitutes for the duty to disclose, produce, or supplement under Rules 26, 34, and 37(c)(1). That is, even if a party has not made a disclosure or production, the party fully meets its obligations by including the document or witness in its pretrial lists. *See* Pl.'s Resp. at 3. Instead of the Rule 37(c)(1) obligation to establish justification or harmlessness for lateness, the party would be subject only to the Appendix A obligation to produce new documents and offer new witnesses for discovery.

Some of this Court's cases could be read in that way. *See Univ. of South Florida, Bd. of Trustees v. United States*, 153 Fed. Cl. 383, 386 (2021); *Scott Timber Inc. v. United States*, 93 Fed. Cl. 221, 223 (2010); *Globe Savings Bank, F.S.B. v. United States*, 61 Fed. Cl. 91, 101 (2004). But that reading excises requirements for timely disclosure — and the consequences of untimely disclosure — from this Court's Rules. *See Orient Overseas Container Line (UK) Ltd. v. United States*, 52 Fed. Cl. 805, 808 (2002) (rejecting an interpretation of the RCFC that would "violat[e] a basic canon of statutory construction that a statute is to be interpreted to give effect to all

of its parts"); *see also Republic of Ecuador v. Mackay*, 742 F.3d 860, 864 (9th Cir. 2014) (explaining that as with interpretation of statutes, "[a]n interpretation [of the Federal Rules of Civil Procedure] that gives effect to every clause is generally preferable to one that does not"). It would also lead to some of the worst imaginable incentives for litigation: Parties that fail to make timely disclosures, productions, and supplementations could avoid Rule 37(c)(1) by delaying even more, until the time comes to exchange pretrial lists.

Discovery would devolve into an exercise in sandbagging if parties really could withhold their exhibits and witnesses until pretrial preparations. This Court's Rules should be interpreted to discourage such strategies. *See* RCFC 1 ("[The RCFC] should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.").

The better interpretation of the Rules is that while disclosure of a document or witness for the first time in a pretrial list is not categorically forbidden, parties remain obligated to make disclosures and productions under Rules 26 and 34, consistent with Rule 37(c)(1). A party might choose to avail itself of the opportunity to disclose documents or witnesses under Appendix A's pretrial list procedures, but whether they should be allowed to present new material at trial must still be evaluated under Rule 37(c)(1).[9]

## B. Plaintiff's undisclosed documents and witnesses

### 1. *Exhibits*

There are four exhibits at issue, numbered 72, 73, 85, and 86. *See* Pl.'s Trial Exhibit List, Def.'s Ex. 3 ("Pl.'s Ex. List") at 5–6 (ECF 114-3).[10]

Exhibit 72 is a check for sand removal dated in summer 2021. Pl.'s Ex. List at 5. Plaintiff mentioned checks in its initial disclosures, Pl.'s Initial Disclosures, Def.'s Ex. 1 at 2 (ECF 114-1), thus satisfying RCFC 26(a). But the government also

---

[9] Rule 37(c)(1) mirrors Federal Rule of Civil Procedure 37(c)(1), and this Court examines the related federal law interpreting the Federal Rules of Civil Procedure as persuasive. *Widdoss,* 989 F.2d at 1178 n.7. Circuits apply different factors to assess whether a failure to disclose or supplement is "substantially justified or is harmless" under Federal Rule of Civil Procedure 37(c)(1). *See Science Applications International Corp. v. United States,* 163 Fed. Cl. 257, 272–73 (2022) (summarizing the various multi-factor tests); *Banks v. United States*, 75 Fed. Cl. 294, 298–99 (2007); *see also, e.g.*, *MicroStrategy Inc., v. Bus. Objects, S.A.*, 429 F.3d 1344, 1357 (Fed. Cir. 2005) (quoting *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596 (4th Cir. 2003)) (assessing the harmlessness of a nondisclosure by considering surprise, ability to cure, disruption of trial, importance of the testimony, and the party's explanation).

[10] One other exhibit — the transcript of the deposition of a newly identified witness — will be discussed below. The government mistakenly sought to exclude Plaintiff's proposed Exhibits 70 and 71, Def.'s Mot. at 6, even though these documents were provided to the government during discovery. The government withdrew its initial objections to these documents. Def.'s Reply at 1 n.1.

requested under RCFC 34 that Plaintiff *produce* checks. Def.'s First Set of Requests for Production, Def.'s Ex. 6 ("Def.'s Requests") at 8 (ECF 114-6). Plaintiff did not produce it until exhibit lists were exchanged in May 2022, approximately two years after fact discovery closed and approximately one year after expert discovery closed. The production is untimely.

Given — as explained above — that Plaintiff cannot justify late disclosure under Appendix A alone, the question is whether his failure to produce the check earlier was "substantially justified or is harmless[.]" RCFC 37(c)(1). Plaintiff has presented no justification other than meritless legal argument. Besides relying on Appendix A, Plaintiff seeks to excuse the delay on the theory that he was not obligated to supplement his disclosures or discovery responses between the close of discovery and the exchange of pretrial lists. Pl.'s Resp. at 3–6. As mentioned above, that argument contradicts all known authority on the subject.

Nor is the untimely disclosure harmless. Because fact and expert discovery closed before Plaintiff produced Exhibit 72, the government was not able to address it during depositions. Furthermore, given that trial is likely to focus on expert valuations of the taking, potential trial evidence has to be considered not just in isolation, but as factual grounding for expert opinions. The government had no way to cure the potential harm without re-opening fact or expert discovery. Courts regularly conclude that untimely productions after the close of discovery are not harmless. *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1369 (Fed. Cir. 2006); *see also Ingenco Holdings, LLC v. Ace American Ins. Co.*, 921 F.3d 803, 821 (9th Cir. 2019); *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 280 (5th Cir. 2009); *Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008); *Wong v. Regents of Univ. of California*, 410 F.3d 1052, 1062 (9th Cir. 2005).

Exhibit 73 is an estimate, dated in April 2022, of the cost of sand removal using a vacuum truck. Pl.'s Ex. List at 5. The relevance of the estimate is to contradict Mr. Caramanna's RSMeans estimate for the cost of sand removal. *See* Pl.'s Mot. at 13. Plaintiff's production — almost a year after the close of expert discovery — was untimely.[11]

Although the document was not dated until more than half a year after the close of expert discovery, Plaintiff has provided no justification for failing to *obtain* it so late. If Plaintiff had been diligent, it presumably could have been obtained and produced in time for the parties to address it in expert reports or depose the company that prepared it. As with Exhibit 72, the late production is not harmless because the

---

[11] The government had requested that Plaintiff produce "all documents you intend to rely upon to support the claims alleged in the Complaint." Def.'s Requests at 8.

government had no way to cure the potential harm without re-opening discovery. *See, e.g.*, *Ingenco*, 921 F.3d at 821; *Hoffman*, 541 F.3d at 1180.

Exhibits 85 and 86 are composites of photographs of Plaintiff's property that were taken in 2021 and 2022. Pl.'s Ex. List at 6. Even if some of the documents depict the property as it existed after the close of discovery — and thus could not have been produced during the regular deadlines — the case's record needs to settle at some point. Def.'s Mot. at 5.

Plaintiff responds that late production is justified because trial should account for the property's ongoing condition. Pl.'s Resp. at 10. But the taking in this case is a one-time event that occurred when the property's condition stabilized. *Prakhin v. United States*, 122 Fed. Cl. 483, 488–89 (2015); *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000); *United States v. Dickinson*, 331 U.S. 745, 749 (1947). The parties' experts appear to assume that the property's condition is stable, enabling them to perform their damages valuations. Because valuation of property includes the property's future value, new photographs should not matter to Plaintiff on the merits. That leaves no justification for adding new photographs.

But even assuming the photographs are relevant to expert opinions, the opinions would then need to be revised if the photographs are to be used at trial. The only way to cure the potential harm would be to re-open discovery, which would be harmful. *See Ingenco*, 921 F.3d at 821; *Hoffman*, 541 F.3d at 1180.

Plaintiff remains entitled to use the proposed exhibits for any other purpose permitted by the Federal Rules of Evidence.

*2. Witnesses*

Plaintiff also disclosed four fact witnesses for the first time when the parties exchanged pretrial lists: two of Plaintiff's neighbors (Anna Shteynberg and Avital Linder), a person Plaintiff claims he paid to do work on his property (Hal Greenberg), and an official of the United States Army Corps of Engineers (Anthony Ciorra) who was previously deposed in jurisdictional discovery but who had not been identified before as a merits witness. *See* Pl.'s Witness List, Def.'s Ex. 2 (ECF 114-2); Pl.'s Rebuttal Witness List, Def.'s Ex. 4 (ECF 114-4); Def.'s Mot. at 7–8. The identification of those witnesses was untimely.

Plaintiff observes that Mr. Greenberg was mentioned in Plaintiff's interrogatory response. Pl.'s Resp. at 7. But that does not satisfy Rule 26 disclosure obligations because it does not give the government any notice that the witness was one Plaintiff "may use to support its claims" at trial. RCFC 26(a)(1)(A)(i); *see Ollier v. Sweetwater Union High School Dist.*, 768 F.3d 843, 861–63 (9th Cir. 2014); *Hinkel v.*

*Colling*, 341 F.R.D. 694, 697–98 (D. Wyo. 2022); *Poitra v. School District No. 1 in the County of Denver*, 311 F.R.D. 659, 663–68 (D. Colo. 2015); *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1168–69 (D. Colo. 2015) ("To satisfy the 'made known' requirement, a party's collateral disclosure of the information that would normally be contained in a supplemental discovery response must [be] in such a form and of such specificity as to be the functional equivalent of a supplemental discovery response; merely pointing to places in the discovery where the information was mentioned in passing is not sufficient."); *Auraria Student Housing at the Regency, LLC v. Campus Village Apartments, LLC*, No. 10-cv-02516-WLM-KLM, 2014 WL 2933189, at *2 (D. Colo. June 30, 2014) ("[K]nowledge of the existence of a person is distinctly different from knowledge that the person will be relied on as a fact witness.").

Plaintiff also tries to excuse his late disclosure of Mr. Ciorra, and the accompanying transcript of his deposition, Pl.'s Rebuttal Trial Exhibit List, Def.'s Ex. 5 (ECF 114-5), by arguing that Mr. Ciorra was previously deposed. Pl.'s Resp. at 8. But Mr. Ciorra was previously deposed about a jurisdictional issue related to the statute of limitations. Tr. at 71. The government was not provided with any notice that Plaintiff intended to use Mr. Ciorra to testify about valuation, so the earlier deposition again does not satisfy Rule 26 disclosure obligations. *Id.* at 73–74; Def.'s Reply at 6.

There is no justification for the late disclosure of fact witnesses, for Plaintiff could have decided at any point to rely on those individuals' testimony. His only explanation for delay relates to his neighbors, Ms. Shteynberg and Mr. Linder. Plaintiff's counsel explained at argument that Plaintiff did not know until later that his neighbors were willing and available to serve as witnesses. Tr. at 86. But Plaintiff could have compelled his neighbors to testify. *See* RCFC 45. Although wanting to preserve neighborly peace might have been a reasonable decision in Plaintiff's community, it does not justify surprising the government with new witnesses at the last minute.

The late disclosure of three of the fact witnesses, Ms. Shteynberg, Mr. Linder, and Mr. Greenberg, is also not harmless. If Plaintiff were permitted to include those fact witnesses at trial, this Court would have to allow for additional discovery. RCFC App. A, R. 13(b). That opportunity is not enough to make it harmless, for the government would have to scramble to depose more people at this late stage and possibly reopen expert discovery. *See Ollier*, 768 F.3d at 861–63; *Markson v. CRST Int'l, Inc.*, No. 5:17-cv-1261-SB, 2021 WL 5969519, at *3 (C.D. Cal. Nov. 23, 2021).

However, Plaintiff's counsel reports that Mr. Ciorra's previous deposition covers some of the merits issues on which he would testify at trial. Tr. at 99–101. It appears that it would be harmless to allow Plaintiff to elicit from Mr. Ciorra the specific pieces of information to which he testified at his deposition. His deposition may be used for any evidentiary purpose consistent with that limitation.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge